2024 IL App (1st) 230796-U

SIXTH DIVISION

August 23, 2024

No. 1-23-0796

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).
_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT
_____

| | | |
|---|---|---|
| FRANK ADKINS, SR., | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 22 M1 450106 |
| | ) | |
| CITY OF CHICAGO DEPARTMENT OF STREETS AND SANITATION | ) ) | |
| | ) | |
| Defendant-Appellant | ) | |
| and | ) | |
| | ) | |
| CITY OF CHICAGO DEPARTMENT OF ADMINISTRATIVE HEARINGS, | ) ) | |
| | ) | Honorable |
| Defendant. | ) | Leonard Murray, |
| | ) | Judge, presiding. |

_____

JUSTICE C.A. WALKER delivered the judgment of the court.
Presiding Justice Oden Johnson specially concurred.
Justice Tailor dissented.

**ORDER**

¶ 1    ***Held:***    We vacate the order of the Administrative Law Judge (ALJ) and remand to the City of Chicago Department of Administrative Hearings for a new hearing because the ALJ denied appellee his due process rights at the vehicle impoundment hearing.

¶ 2    The City of Chicago Department of Streets and Sanitation and City of Chicago Department of Administrative Hearings appeal the circuit court's reversal of the ALJ's ruling upon administrative review. The ALJ found the vehicle impoundment proper, and the circuit court reversed finding the ALJ's ruling was not supported by the law. For the following reasons, we remand this matter to the City of Chicago Department of Administrative Hearing for a fair hearing to be held before a different ALJ.

¶ 3                                    I. BACKGROUND

¶ 4    On May 12, 2022, around 10:37 pm, Appellee Frank Adkins, Sr. pulled up next to a parked vehicle so he could park behind that vehicle. Adkins was driving, and his son was a passenger. While on routine patrol in the 6700 block of South Rhodes Ave, Chicago police officers Zackery Nasir and Ricardo Rivera noticed Adkins' white Porsche Cayenne and believed it to be "double parked." While speaking with Adkins and his son, the officer "smelled a strong odor of cannabis emitting from the vehicle," and ordered both to exit so that the vehicle could be searched. During the search, the officer found a loaded firearm in the glove box. Because neither occupant produced a valid Firearm Owners Identification (FOID) Card or Concealed Carry License (CCL), the officers impounded the vehicle. The next day, Adkins paid $2175 to retrieve his vehicle: a $2000 fine for "firearm vehicle impoundment," a $150 towing fee, and a $25 storage fee.

¶ 5    Adkins requested an administrative hearing with the Department of Administrative Hearings (DOAH) to contest the City of Chicago's (City) impoundment decision. At a preliminary

hearing on May 16, 2022, Adkins appeared *pro se* before ALJ Dennis Guest. The City asked the ALJ to set the matter for a full hearing so it could prove that "an unlawful firearm was in the vehicle because the passenger did not have a FOID or CCL." The ALJ set the case for hearing.

¶ 6     On June 1, 2022, Adkins appeared *pro se* before ALJ Michael Cawley. At the hearing, Nasir testified that he was on routine patrol with Rivera when they observed Adkins' vehicle "double parked." They curbed the vehicle and spoke with Adkins. During the conversation, Nasir smelled a strong odor of cannabis coming from the vehicle and saw a multi-colored package in Adkins' son's left front pocket "consistent" with cannabis packaging. Nasir and his partner removed Adkins and his son, searched the vehicle, and discovered a loaded firearm with an extended magazine in the glove box. After determining that neither Adkins nor his son had a valid FOID card or a CCL, the officers impounded the vehicle and inventoried its contents.

¶ 7     Adkins, along with counsel for the City, appeared for an administrative hearing. During Adkins' cross-examination of Nasir, Adkins stated, "we never saw a firearm," then asked Nasir, "If we pull up on the side of somebody and [are] about to park, what do you consider being double parked?" Nasir responded, "So the violation for that specific parking ticket is no parking or standing. So, you would be considered[ed] standing at that location." Adkins continued, "So if I'm standing there *** and there's no way for me to actually park because there's a bus coming to the left of me. So, I have to let the bus pass for me to actually get into a position where I could actually go back and park correctly **** So how do you consider that being *** double parked?" Nasir responded, "That could also be considered as standing. That's what the violation is. A park/stand violation."

¶ 8     Adkins then asked, "So you're telling me everybody that pulls up on the side and parks, are you telling me you have to pull up on the side of a car to reverse and park as standing for you?"

3

The ALJ intervened, stating, "Officer, you don't have to answer that. And City, you're free to object to questions that aren't questions." Anything else you wanted to ask him, sir?" Adkins responded "No, it's okay."

¶ 9 After Nasir's testimony, the ALJ asked Adkins if he had anything else to say. Adkins responded, "I just feel like the stop was just *** it was not accurate for the [police to] call [it a] stop. *** So, what was the reason for even pulling me over?" Before Nasir could respond, the ALJ said, "We're past questions now."

¶ 10 In closing, the City argued Nasir's testimony and the City's exhibits, including the inventory report and the vehicle impoundment report, established by a preponderance of the evidence that the vehicle contained an unlawful firearm. The City noted that "[Adkins] appear[ed] to be making an argument that there was no probable cause for the stop" and that "the Fourth Amendment leads to the exclusion of this evidence." However, the City noted that "this is a civil courtroom and *** [Adkins] failed to make a defense recognized in the ordinance."

¶ 11 After the City's argument, the ALJ asked if Adkins wanted to say anything, to which Adkins responded, "I would like to ask him a question. In the proper procedure when you find a weapon in a vehicle, do you show the people – if I'm driving the vehicle and you found a weapon in my vehicle, do you show me the weapon so I can know it's in there? Or you just take the weapon and just say, 'Oh, we found the weapon?' " The ALJ Responded, "No, no, no questions. That's over. We're way past questions. We're past testimony." When Adkins expressed confusion, stating, "But you asked me did I have a question," the ALJ responded, "The evidence is in."

¶ 12 The ALJ found the impoundment proper, stating, "There was a gun in the car. What brought the police there, brought them there. I don't know about the double park. When they got there, they found a gun. Now there's one less out there."

4

¶ 13    Adkins appealed the ALJ's decision to the circuit court. At a hearing before the court on February 21, 2023, Adkins argued that the impoundment was improper because it was "an improper stop. It was an illegal stop that they did. So, if [the police] wouldn't have made an illegal stop, we would never *** [have had] to take my car to the pound, or none of that." The circuit court asked the City to articulate the basis for the stop and the City explained Adkins was double parked. The court then asked the City to define "parking." Without directly responding, the City stated, "the reason for why the vehicle is stopped does not affect the vehicle being impounded." The court responded, "Sure, it does. If there's no basis for the stop, then there is no basis for impoundment." The City clarified that "the basis for being impounded is for recovery of the firearm in the car[,]" but the court dismissed the City's argument, stating, "No, it's not. You don't get – there's no basis for the stop." The court reasoned that the vehicle could not have been "double parked" because Adkins and his son were still in the vehicle when the officers stopped it. Therefore, the court found "no basis for the stop" and "no violation of the ordinance," and reversed the ALJ's decision.

¶ 14    After the hearing, the City filed a motion in which it asked the circuit court to reconsider its decision to apply the exclusionary rule based on *McCullough v. Knight*, 293 Ill. App. 3d 591, 598 (1997), where this court determined that the exclusionary rule does not apply to vehicle impoundment proceedings. The court denied the motion, and the City filed this appeal.

II.                                ANALYSIS

¶ 15    The City timely appealed the circuit court's denial of its motion to reconsider, giving this court jurisdiction under Illinois Supreme Court Rule 303 (eff. July 1, 2017).

¶ 16    Initially, we note that Adkins did not submit a brief. Nevertheless, because the record is simple, and the City raises a single issue on appeal—whether the circuit court reversibly erred

5

when it found that the exclusionary rule applies to vehicle impoundment proceedings—we may consider the merits of the appeal. See *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 131-33 (1976).

¶ 17     This case involves our review of the decision of an administrative agency. See *Downtown Disposal Services, Inc. v. City of Chicago*, 407 Ill. App. 3d 822, 827 (2011) ("The Illinois Administrative Review Law applies to final decisions by the DOAH."). On review of an administrative agency decision, the appellate court reviews the agency's decision, not that of the circuit court. *Id.* This is true even where the circuit court reverses the agency's determination. See *Anderson v. Illinois Department of Professional Regulation*, 348 Ill. App. 3d 554, 559-60 (2004).

¶ 18     The standard of review an appellate court uses in reviewing an agency's decision depends on the issue. Factual findings are deemed *prima facie* correct and will only be reversed if against the manifest weight of the evidence. *Western Illinois University v. Illinois Educational Labor Relations Board*, 2021 IL 126082, ¶ 30. Purely legal determinations are reviewed *de novo*. *Id.* If a case "involves an examination of the legal effect of a given set of facts, it involves a mixed question of law and fact, and the administrative agency's decision will be affirmed unless clearly erroneous." *Anderson*, 348 Ill. App. 3d at 560.

¶ 19     "Administrative hearings, like judicial proceedings, are governed by fundamental principles and requirements of due process of law." *Scatchell v. Board of Fire and Police Commissioners for Village of Melrose Park*, 2022 IL App (1st) 201361, ¶ 116. Due process involves, at a minimum, "impartial rulings on the evidence, an opportunity to be heard, and the right to cross-examine adverse witnesses." *Id.*; see also *Anderson v. Human Rights Comm'n*, 314 Ill. App. 3d 35, 41 (2000); *Hazelton v. Zoning Board of Appeals of City of Hickory Hills, Cook County,* 48 Ill. App. 3d 348, 351 (1977).

6

¶ 20    As previously stated, this case was taken for review based on the City's brief only. As here, self-represented litigants often do not file a brief, but we are still required to review the entire record. We acknowledge that the parties did not brief the due process issue, but we review it pursuant to our authority under Illinois Supreme Court Rule 366. We note that a reviewing court has the power to raise unbriefed issues under Supreme Court Rule 366(a)(5) (West 2022). We also note that we have a duty to examine the procedural methods used at the administrative hearings to ensure they accord with due process requirements, but administrative hearings need not be in the nature of a full judicial proceeding. *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 92 (1992). This court may order a new hearing when an administrative hearing does not accord with due process requirements and a claimant can show prejudice from this failure. See *Engle v. Department of Financial and Professional Regulation*, 2018 IL App (1st) 162602, ¶¶ 69-72; *Williams v. Board of Trustees of Morton Grove Firefighters' Pension Fund*, 398 Ill. App. 3d 680, 695 (2010). "A claim that an administrative proceeding violated an individual's right to due process presents a question of law, and therefore, is subject to *de novo* review." *Engle*, 2018 IL App (1st) 162602, ¶ 43.

¶ 21    Here, we find the conduct of the ALJ so affected the integrity, and perception of fairness that we invoke our discretion to raise this due process issue *sua sponte*. St. Ct. R. 366. We have a duty to ensure that a fair and impartial procedure was used. *Booker v. Bd. of Educ.*, 2016 IL App (1st) 151151, ¶ 57. "A fair hearing before an administrative agency includes the opportunity to be heard, the right to cross-examine adverse witnesses, and impartiality in ruling upon the evidence." *Abrahamson*, 153 Ill. 2d 76, 95. "If the procedures used by an administrative agency violate fundamental fairness and a party's due process rights, the appellate court should reverse the agency's decision." *Booker*, 2016 IL App (1st), ¶ 58.

¶ 22    Pursuant to our review of the record, we find that the ALJ denied Adkins his due process rights and the right to a fair hearing because he did not permit Adkins a meaningful opportunity to cross-examine Nasir. Despite the city having a licensed attorney appearing on its behalf, the ALJ objected to the questioning and failed to allow Adkins to present his complete defense in a case where the officer did not show the owner from where the gun was recovered and failed to present an inventory report.  As stated, a reviewing court has the duty to examine methods to ensure the requirements of due process were followed, and here, they were not. *Human Rights Comm'n*, 314 Ill. App. 3d at 41, 48-49.

¶ 23    During the questioning of Nasir, the ALJ interrupted Adkins as Adkins asked: "So you're telling me everybody that pulls up on the side and parks, are you telling me you have to pull upon the side of a car to reverse and park as standing for you?" In addition to the interruption, the ALJ stated: "Officer, you don't have to answer that." The ALJ then encouraged the City to object to questions. Immediately following these statements, the ALJ asked Adkins: "Anything else you wanted to ask him, sir?" Adkins responded, "No, it's okay." Shortly thereafter, however, Adkins attempted to ask two other questions, which the ALJ refused because purported procedural concerns. It is apparent from this record that the ALJ halted the questioning and then denied Adkins a chance to finalize his questioning. This conduct by the ALJ, in its totality, denied Adkins a meaningful opportunity to cross examine Nasir, and, by extension, his right to a fair hearing. See *Williams*, 398 Ill. App. 3d at 693-94 (denial of a fair hearing can result from "a single egregious act or a combination of less offensive acts").

¶ 24    We also find that Adkins suffered prejudice because the ALJ denied the chance to explore potentially valid defenses. Specifically, the ALJ terminated the questioning regarding the circumstances of the alleged firearm recovery, based only on the "evidence" being "in." Adkins

stated during the hearing that the officers never showed him a firearm, meaning any potential testimony from Nasir which supported Adkins on this point could have influenced the ultimate decision on whether Nasir's account regarding the alleged recovery was credible. Accordingly, the ALJ's act to limit Adkins from an opportunity to elicit such testimony was improper, particularly where the city attorney did not object to the questioning and in light of the fact that procedural strictures may be loosened at administrative hearings as compared to judicial proceedings, making it well within the ALJ's discretion to permit the questioning even if the "evidence" was "in." See *Engle*, 2018 IL App (1st) 162602, ¶ 43 (citing *Abrahamson*, 153 Ill. 2d at 92).

¶ 25    The ALJ denied Adkins his due process rights at the hearing, and Adkins suffered prejudice from this denial, making vacatur and remand for a new hearing appropriate. *Id.* ¶¶ 69-72. At the new hearing, we find the interests of justice suggest a different ALJ is required. See *People v. Serrano*, 2016 IL App (1st) 133493, ¶ 45 (Illinois Supreme Court Rule 366(a)(5) (eff. Feb. 1, 1994) permits reviewing courts to reassign matters on remand).

¶ 26    Finally, because we vacate on due process grounds, we do not reach the exclusionary rule issue. This issue arose from the circuit court's order reversing the ALJ's decision, an order now obviated, rendering any discussion of the exclusionary rule issue advisory. See *Peach v. McGovern*, 2019 IL 123156, ¶ 64.

¶ 27    We find the procedures here troubling not only because of the ALJ's failure to provide due process, but also because of the nature of the police stop which appears to be Driving While Black.

¶ 28    DWB had no bearing on our analysis or final ruling here, but we find that it must be acknowledged so that our State can begin to move forward with 21st Century policing. See Instructor's Manual for Community Policing: A Policing Model for the 21st Century, Michael J. Palmiotto (Recognizing that a justice system or more specifically a policing system, that creates

and cultivates a model of enforcement that increases unnecessary civilian contact is a broken system.)

¶ 29    We acknowledge this court's analysis in *People v. Carpenter*, 2024 IL App (1st) 220970 (Justice Hyman writing for the majority). There this court noted:

"Driving While Black: A Matter of Public Safety and Racial Justice

Appellate courts deal with the issues and the record before them. On rare occasions, however, a far-reaching but unexamined and unbriefed concern emerges so affecting the integrity and perception of fairness that we invoke our discretion to raise it on our own, in Latin, *sua sponte*. See *Hormel v. Helvering*, 312 U.S. 552, 557, 61 S. Ct. 719, 85 L. Ed. 1037 (1941) ('Rules of practice and procedure are devised to promote the ends of justice, not to defeat them. A rigid and undeviating judicially declared practice under which courts of review would invariably and under all circumstances decline to consider all questions which had not previously been specifically urged would be out of harmony with this policy. Orderly rules of procedure do not require sacrifice of the rules of fundamental justice.') Here, fundamental justice calls for us to raise a concern vital to public safety although it has no role in our resolution on the merits.

What is known as 'driving while Black' (DWB) is a pernicious reality that corrodes trust in law enforcement and the legal system. DWB involves police using 'stereotypical thinking and hunches' and 'dubious investigative techniques' in traffic stops. *Commonwealth v. Feyenord*, 445 Mass. 72, 833 N.E.2d 590, 604 (Mass. 2005) (Greany, J., concurring). Numerous studies have extensively documented the unsettling reality of DWB. See Emma Pierson et al., A Large-Scale Analysis of Racial Disparities in Police Stops Across the United States, 4 Nature Hum. Behav. 736 (2020),

10

https://5harad.com/papers/100M-stops.pdf [https://pernia.cc/2Y9S-VLFA] (analyzing nearly 100 million stops across nation between 2011 and 2018 and finding Black drivers were less likely to be stopped after sunset when 'veil of darkness' masked race); Ill. Dep't of Transp., Illinois Traffic and Pedestrian Stop Study 2022 Annual Report: Pedestrian Stop Analysis 18-19 (2023), https://idot.illinois.gov/content/dam/soi/en/web/idot/documents/transportationsystem/rep orts/safety/traffic-stopstudies/final--part-i-executive-summarypedestrian-6-30-23.pdf [https://penna.cc/ZUE8-2TFR] (racial profiling possible factor in traffic stops); see 2024 Ill. App. LEXIS 749, **2 also Pascal Sabino, Cops Rarely Pull Over Drivers In Their Own Neighborhoods, Data Shows. Motorists In Black Neighborhoods Aren't So Lucky, Block Club Chi. (Oct. 27, 2021), https://blockclubchicago.org [https://perma.cc/PHC2-JEMD] (mapping all 327,224 traffic stops by Chicago police in 2020 and finding 'tremendous bulk of drivers' stopped in neighborhoods on the South and West sides and 'few drivers' stopped in mostly white neighborhoods on North Side).

The General Assembly has responded, precluding stops on the then lawful basis offered by the officer in this case. See Pub. Act 103-32, § 5 (eff. Jan. 1, 2024) (adding 625 ILCS 5/12-503(c-5)) (directing, '[n]o motor vehicle, or driver or passenger of such vehicle, shall be stopped or searched by any law enforcement officer solely on the basis of a violation or suspected violation of [the material obstruction] subsection').

Much of the evidence presented to the trial court consisted of body-camera footage that two of the arresting officers recorded. Although DWB does not enter our legal analysis and decision, the record compels our posing a question—would this stop have proceeded as it did had [the person stopped] been white?

11

Asking the question stimulates dialogue on racial justice and public safety. See generally Press Release, Ill. Supreme Court, Supreme Court Releases Statement on Racial Justice, Next Steps for Judicial Branch (June 22, 2020), https://www.illinoiscourts.gov [https://penna.cc/E66J-2ZYX]. It also reinforces the judiciary's commitment to upholding the principles of justice and reinforcing public trust in the legal system. See, e.g., *State v. Clinton-Aimable*, 2020 VT 30, ¶ 37, 212 Vt. 107, 232 A.3d 1092 (Reiber, C.J., concurring) ("Although not specifically presented or addressed, an underlying question in this appeal is the extent to which defendant's race played a role in the decisions by police to stop and search him and his car."); *United States v. Mendenhall*, 446 U.S. 544, 558, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980) (observing, under fourth amendment, race is 'not irrelevant' though not 'decisive' either); *United States v. Smith*, 794 F.3d 681, 688 (7th Cir. 2015) (same).

Addressing the specter of DWB is crucial to the dismantling of this systemic injustice. Several essential indicators of DWB are laid bare by the evidence, including (i) minor infractions as a pretext for investigating unrelated suspicions; (ii) stereotypes or assumptions about race based on police conduct or statements during the stop; (iii) prolonged detention inconsistent with the nature of the stop; (iv) a search without proper justification, usually based on stereotypes rather than reasonable suspicion, (v) unequal enforcement, such as pulling over a person [who is Black or Latinx], for a violation seldom of consequence in a white neighborhood; (vi) targeting neighborhoods or areas predominately populated by [Black or Latinx people]; and (vii) use of disrespectful behavior, aggression, or excessive force by police. Individually or together, the elements do not indicate or imply racial bias, and most police officers strive to act properly and respectfully. Nevertheless, the more indicators, the more likely the stop was for DWB."

¶ 30                               III. CONCLUSION

¶ 31    Based on our analysis of the due process violations, we vacate the ALJ's decision and remand to the City of Chicago Department of Administrative Hearings for a fair hearing before a different ALJ.

¶ 32    Vacated and remanded with instructions.

¶ 33    Presiding Justice Sharon Oden Johnson, specially concurring:

¶ 34    I agree that we must reverse the administrative law judge, and I presume that the City will proceed in a manner that affords plaintiff Adkins due process. I write separately to provide further support and to address the threshold question of whether the City of Chicago satisfied its burden of proof, under its own Municipal Code of Chicago (Code), specifically under § 2-14-132(h)(4), which was discussed by the parties and the court below. I contend that the answer to that question is no; the City failed to satisfy its burden of proof.

¶ 35    Before addressing the City's burden of proof, I note that the principles of *First Capitol* govern our review, where we have accepted an appeal on an appellant's brief only. *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 131-33 (1976). That case provides that, while we are not compelled to serve as an advocate for the appellee or search the record for the purpose of affirming the trial court, we may do so, when justice requires. *First Capitol,* 63 Ill. 2d at 133. It is disingenuous to argue against considering an issue because it was unbriefed on appeal, when this *pro se* defendant was advised specifically by the trial court that there was nothing more for him to do and "[y]ou won." In this case, "justice requires" a review of the record, for the reasons explained by the majority and for the additional reasons that I explain below. *First Capitol,* 63 Ill. 2d at 133.

¶ 36    To justify imposing a fine on plaintiff, the City of Chicago had the burden of proof, and the elements of the alleged violation had to be proven by a preponderance of the evidence. Code § 2-14-076(i) ("[n]o violation may be established except upon proof by a preponderance of the evidence"), 2-14-132(b)(3) (ALJ must make his or her determination by a preponderance). See also *Saladrigas v. City of O'Fallon*, 2020 IL App (5th) 190466, ¶¶ 17-18 (a fine is a punishment, while a fee is a charge to recoup expenses). While the formal rules of evidence did not apply, evidence could be admitted only if it was of such a caliber that a reasonably prudent person would commonly rely on it in the conduct of his or her own affairs. Code § 2-14-076(h). An ALJ may issue orders only if they are "consistent" with the applicable provisions of the Code.  Code § 2-14-076(l).

¶ 37    There is no dispute as to plaintiff's ownership of the car in question.  Although, plaintiff has already retrieved his car, he is now seeking a refund of the money he had to pay for the release of the car from the impound facility pursuant to Code § 2-14-132(b)(5) (the "Impoundment" section applies whether or not the vehicle is being held at a City facility).  The Code also provides that "[I]nterest on any debt due and owing shall accrue at the rate set for interest upon judgments." Code § 2-14-104.

¶ 38    This case started out as a criminal case against plaintiff's son, and plaintiff argued repeatedly that the State threw that criminal case out. Before the ALJ on May 16, 2022, plaintiff argued, under oath, that the case against his son was tossed after a bond hearing because the State had no evidence of a firearm.  On June 1, 2022, the ALJ asked if he had any arguments, and the transcript establishes that plaintiff responded. Unfortunately, all the transcript states at that point is "[Inaudible]" so we do not know what plaintiff did, or did not, argue at that moment before the

ALJ. However, on February 21,2023, and again on March 20, 2023, before the trial court, plaintiff argued, under oath, that the State "threw the case out" at the preliminary hearing.

¶ 39    As discussed in the court below, the Impoundment section of the Code provides, in relevant part:

> "(h) For purposes of the [Impoundment] section, a vehicle is not considered to have been used in a violation that would render the vehicle eligible for towing if: ***
>
> (4) the owner of the vehicle provides adequate proof that a criminal court dismissed all of the alleged criminal violations for which the vehicle was impounded after a judicial finding of the facts of, or laws applicable to, such violations[.]" Code § 2-14-132(h)(4).

¶ 40    At a preliminary hearing, the trial court finds whether there is "probable cause to believe an offense has been committed by defendant." 725 ILCS 5/109-3(a) (West 2020). If the trial court finds probable cause, then the court "shall hold the defendant to answer" for the offense. 725 ILCS 5/109-3(a) (West 2020). "[I]f it appears that there is not probable cause to believe the defendant guilty of any offense the judge shall discharge him." ILCS 5/109-3(b) (West 2020). As noted above, plaintiff testified that his son had a preliminary hearing and they threw the case out. The City argued, without any evidence, that this must have been a nolle pros by the State, rather than a judicial finding of no probable cause.

¶ 41    Counsel for the City said it was her "understanding" that the case was nolle prossed. However, she made no proffer and introduced no evidence, as to what that understanding was based on. Her understanding could have been based, as the court's apparently was, on a guess about what may have happened.

¶ 42    Plaintiff, who had been present at the preliminary hearing and under oath to tell the truth, swore that the case had been tossed out at the preliminary hearing. He was the only person at the

trial court with first-hand knowledge of what had transpired at the preliminary hearing. He gave his sworn testimony that there was a finding of no probable cause, thereby satisfying his burden of coming forward with adequate proof.[1] Code § 2-14-132(h)(4). Without any countering evidence—no transcript, no order, no affidavit from someone who was there—the City failed in its ultimate burden of proof to show a violation by a preponderance of the evidence.

¶ 43     Thus, in addition to a denial of due process, the City did not carry its burden under its own Code[2] and therefore we must reverse the ALJ.  The City has been advised above to proceed in a manner that affords plaintiff Adkins due process.  However, there is another option; Instead of conducting a new proceeding, it could instead refund Adkins' money with interest.

¶ 44     JUSTICE TAILOR, dissenting:

¶ 45     The City raised a single issue in its appeal from the circuit court's decision – whether the exclusionary rule applies in a civil vehicle impoundment proceeding to determine whether a vehicle contained an unlawful firearm. Illinois courts have consistently held the exclusionary rule does not apply to civil proceedings. Indeed, this court has held the exclusionary rule does not apply in the same factual context we face here, finding that the benefit to society in taking illegal firearms off the street and imposing on those who possess them the reasonable cost of implementing the policy outweighs any added deterrent effect in extending the exclusionary rule to the civil administrative proceeding. Reversing the ALJ, the trial court determined that the exclusionary rule applied, and that the evidence of the unlawful firearm found in Adkins' vehicle could not be considered because the police lacked probable cause to search it under the fourth amendment.

---

[1] As noted above, the rules of evidence do not apply. Code § 2-14-076(h).

[2] As a result, I do not reach the issue of unclean hands or the question of whether this was a case of PWB (parking while black, near your own home), which is closely related to the well-documented DWB (driving while black). *People v. Carpenter*, 2024 IL App (1st) 220970, ¶ 6.

Consequently, the trial court determined that Adkins was not liable for the $2,000 vehicle impoundment fee assessed against him by the City. However, because the exclusionary rule does not apply in this civil proceeding, I would reverse the trial court's decision and affirm the decision of the ALJ.

¶ 46 The fourth amendment of the United States Constitution prohibits unreasonable searches and seizures. U.S. Const., amend. IV. The Illinois Constitution provides similar protections. IL Const., art. 1, § 6. However, "[t]here is no constitutional right to have the evidence resulting from an illegal search or seizure suppressed at trial[,]" and "[t]he mere fact of a fourth amendment violation does not mean that exclusion necessarily follows." *People v. LeFlore,* 2015 IL 116799, ¶ 22. In order to safeguard individuals' fourth amendment rights, the Supreme Court created the exclusionary rule. *Id.* ¶ 17; *United States v. Calandra*, 414 US 338, 348 (1974) ("the rule is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved"). "[T]he 'prime purpose' of the rule, if not the sole one, 'is to deter future unlawful police conduct.' " *United States v. Janis,* 428 U.S. 433, 446 (1976) (quoting *Calandra*, 414 U.S. at 347).

¶ 47 While the exclusionary rule bars the admission of evidence obtained in violation of the fourth amendment in criminal trials, it "has never been interpreted to proscribe the use of illegally seized evidence in all proceedings or against all persons." *Calandra,* 414 U.S. at 348. Instead, application of the rule has been restricted to those areas where the objective of deterring unlawful police conduct is "most efficaciously served." *Id.* The Supreme Court developed a balancing test to determine when the exclusionary rule should be applied. *Janis*, 428 U.S. at 453-54; *I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032, 1041 (1984); *U.S. Residential Management and Development, LLC v. Head*, 397 Ill. App. 3d 156, 161-62 (2009). Under this test, the deterrent benefit of

suppression must outweigh the "substantial social costs" for the evidence to be excluded. *United States v. Leon,* 468 U.S. 897, 907 (1984); *Lopez-Mendoza*, 468 U.S. at 1041. "Exclusion exacts a heavy toll on both the judicial system and society at large, as exclusion 'almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence.' " *People v. Manzo,* 2018 IL 122761, ¶ 62 (quoting *Davis v. United States,* 564 U.S. 229, 237 (2011). Moreover, extending the rule to an otherwise "simple" and "streamlined" administrative adjudication system has the potential to "significantly change and complicate the character of" the proceedings, thereby imposing additional costs. *Lopez-Mendoza*, 468 U.S. at 1048. Therefore, "where the costs exceed the benefits, the exclusionary rule may not be applied." *Grames v. Illinois State Police*, 254 Ill. App. 3d 191, 200 (1993).

¶ 48    Under the balancing test, the Supreme Court has never applied the exclusionary rule in the civil context. *Janis*, 428 U.S. at 447 ("In the complex and turbulent history of the [exclusionary] rule, the Court never has applied it to exclude evidence from a civil proceeding, federal or state.") Since *Janis* was decided, the Court has rejected every attempt to apply the exclusionary rule in matters other than criminal trials. See, *e.g., Pennsylvania Board of Probation and Parole v. Scott*, 524 U.S. 357, 369 (1998) (exclusionary rule not applicable in parole revocation hearings); *Lopez-Mendoza*, 468 U.S. at 1051 (exclusionary rule not applicable in civil deportation proceedings). And the Court has held that the exclusionary rule does not apply to derivative use of illegally obtained evidence by a grand jury. *Calandra*, 414 U.S. at 354 ("In the context of a grand jury proceeding, we believe that the damage to that institution from the unprecedented extension of the exclusionary rule urged by respondent outweighs the benefit of any possible incremental deterrent effect.") Consistent with this precedent, this court recently "found no authority *** where the exclusionary rule was applied in an administrative proceeding." *Scatchell v. Board of Fire &*

*Police Commissioners for Village of Melrose Park*, 2022 IL App (1st) 201361, ¶ 102. See also *Grames v. Illinois State Police*, 254 Ill. App. 3d at 199-201 (1993) (discussing cases and holding that the exclusionary rule should not apply to officer misconduct proceedings: "The damage to the operation of an effective State Police force would far outweigh any benefit which would result from application of the exclusionary rule.")

¶ 49    In *McCullough v. Knight,* 293 Ill. App. 3d 591 (1997), a division of this court addressed the very issue before us today: whether the exclusionary rule applies to administrative vehicle impoundment proceedings. Police impounded McCullough's vehicle pursuant to the Chicago Municipal Code after they uncovered a gun during a search of the vehicle. *Id.* at 593. Although McCullough was criminally prosecuted for failing to register the firearm, the court suppressed evidence of the recovered firearm and dismissed the criminal charges against him after the City admitted that the police lacked probable cause to search McCullough's vehicle. *Id*. At an administrative hearing before the City's department of revenue, McCullough moved to dismiss the impoundment proceeding and to recover the money he paid to release his car, arguing that the exclusionary rule should bar the admission of the unregistered firearm in the impoundment proceedings as well because the search violated the fourth amendment. *Id*. at 594. The hearing officer disagreed and found that McCullough was subject to the administrative penalty, and the circuit court affirmed the hearing officer's decision. *Id*. On appeal, this court "balance[d] the benefits of applying the exclusionary rule against the cost 'on the societal interest of law enforcement.' " *Id*. at 597 (quoting *Janis*, 428 U.S. at 448). It found that applying the exclusionary rule would leave the department of revenue "unable to consider valuable and relevant evidence that would impede the truth-finding function of the hearing officer" and also "interfere with the public policy behind the administrative proceeding[,]" which is "the elimination of unlawful

weapons from the streets of the city." *Id*. at 597-98. And because the police had already been "sufficiently 'punished' by exclusion of [the] evidence in [the] criminal prosecution[]" of McCullough, the court did not detect "an added deterrent effect in extending the exclusionary rule to the administrative proceeding that would warrant the cost to society: diminishing the power of the city to rid the city of illegal firearms and imposing on those who possess them the cost of reasonable steps to implement the policy." *Id.* at 598 (quoting *Janis*, 428 U.S. at 448). It therefore concluded that the circuit court did not err when it found the exclusionary rule "inapplicable" to the department of revenue proceedings. *Id.*

¶ 50    No reason exists to depart from this court's holding in *McCullough*. Adkins admitted that he owned the vehicle, and the evidence presented at the administrative hearing established that a firearm with no serial number was located in Adkins' vehicle and that neither Adkins nor his son possessed a valid firearm owner's identification (FOID) card or concealed carry license (CCL). Therefore, the police properly impounded Adkins' vehicle pursuant to Title 8 of the Chicago Municipal Code (Code), which states that "[t]he owner of record of any motor vehicle that contains: (1) a firearm that is carried or possessed in violation of any applicable state or federal law other than the expiration of a FOID card or concealed carry license of a person who otherwise remains qualified under Illinois law to lawfully possess or carry firearms *** shall be liable to the City for an administrative penalty of $2,000 plus any towing and storage fees***. Any such vehicle *shall be subject to seizure and impoundment* pursuant to this section. Chicago Municipal Code § 8-20-070(a) (amended July 22, 2020) (emphasis added).

¶ 51    The trial court, however, found "no basis for this stop or the search" and a "Fourth Amendment violation," and therefore determined that the firearm was illegally obtained and so the ensuing impoundment was improper. However, even if the officers' search of Adkins' vehicle was

illegal and violated the fourth amendment, the exclusionary rule does not automatically apply. *Calandra*, 414 U.S. at 348 ("the exclusionary rule has never been interpreted to proscribe the use of illegally seized evidence in all proceedings or against all persons"); *LeFlore,* 2015 IL 116799, ¶ 22 ("[t]he mere fact of a fourth amendment violation does not mean that exclusion necessarily follows"). Instead, the court must balance the costs and the benefits of applying the exclusionary rule to determine its applicability. Here, I agree with *McCullough* and find that application of the exclusionary rule to the vehicle impoundment proceeding would "interfere with the public policy behind the administrative proceeding[,]" which is "the elimination of unlawful weapons from the streets of the city." *McCullough*, 293 Ill. App. 3d at 598. See also *City of Chicago v. Taylor*, 332 Ill. App. 3d 583, 591 (2002) (recognizing the City's "legitimate governmental interest in reducing crime and firearm-related deaths and injuries by allowing the City to destroy unregistered and unregistrable firearms and encouraging law-abiding firearms owners to register their weapons"); *People v. Jaudon*, 307 Ill. App. 3d 427, 436 (1999) ("it cannot be disputed that the regulation of firearms possession and transportation is a legitimate governmental interest"). I also find that any additional deterrent benefit would be minimal because the State ultimately dismissed its case against Adkins's son, perhaps because of the fourth amendment hurdles it would face to justify the search of Adkins's vehicle. See *Pennsylvania Board of Probation & Parole v. Scott*, 524 U.S. at 364 (declining to apply the exclusionary rule to a parole revocation proceeding, finding that that it "would provide only minimal deterrence benefits *** because application of the rule in the criminal trial context already provides significant deterrence of unconstitutional searches."); *Janis*, 428 U.S. at 448 (finding application of the exclusionary rule in a federal civil tax proceeding unnecessary, because the local law enforcement official "is already 'punished' by the exclusion of evidence" in the criminal context).

21

¶ 52    This conclusion is in accord with decisions of Illinois courts declining to extend the exclusionary rule in a number of civil contexts. See, *e.g., U.S. Residential Management and Development, LLC v. Head,* 397 Ill. App. 3d at 163 (finding that suppression of illegally seized evidence in a civil forcible entry and detainer action was not required, because it would leave the CHA "unable to consider valuable and relevant evidence of potential criminal activity that would impede the truth-finding function of the circuit court[,]" "would hinder CHA's ability to enforce lease agreements designed to promote safety and deter illegal conduct in public housing communities", and the police officers were "sufficiently punished by the exclusion of evidence in criminal prosecutions"); *Grames v. Illinois State Police*, 254 Ill. App. 3d at 201 (declining to extend the exclusionary rule to an administrative police discharge proceeding because it "would effectively prohibit the introduction and consideration of relevant and probative evidence and hamper the [Merit] Board's ability to enforce departmental rules and deter and punish inappropriate conduct", and "[t]he damage to the operation of an effective State police force would far outweigh any benefit which would result from application of the exclusionary rule"). Accordingly, I find – in line with *McCullough* – that the exclusionary rule does not apply to civil vehicle impoundment proceedings.

¶ 53    The majority avoids addressing the exclusionary rule issue by *sua sponte* concluding that Adkins' due process rights were violated when the ALJ did not permit him to ask three questions of a police officer at the administrative hearing. When a party raises a procedural due process issue, a reviewing court " 'has a duty to examine the procedural methods employed at the administrative hearing, to insure that a fair and impartial procedure was used.' " *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 92-93 (1992) (quoting *Middleton v. Clayton*, 128 Ill. App. 3d 623, 630 (1984)). Here, however, Adkins never raised a due process

argument at his administrative hearing, before the trial court, or before this court, and the State was given no opportunity to respond. Accordingly, I disagree with the majority's decision to *sua sponte* raise a due process issue here. See *Texaco-Cities Service Pipeline Co. v. McGaw,* 182 Ill. 2d 262, 278 (1998) ("In general, issues or defenses not placed before the administrative agency will not be considered for the first time on administrative review.")

¶ 54    Although a reviewing court has the power to raise unbriefed issues under Supreme Court Rule 366(a)(5) (West 2022), it must refrain from doing so when it would transform the appellate court's role "from that of jurist to advocate." See *People v. Givens,* 237 Ill.2d 311, 324 (2010) (quoting *People v. Rodriguez,* 336 Ill. App. 3d 1, 14 (2003)) (" 'Were we to address these unbriefed issues, we would be forced to speculate as to the arguments that the parties might have presented had these issues been properly raised before this court. To engage in such speculation would only cause further injustice; thus we refrain from addressing these issues *sua sponte*.' ") That concern is particularly pronounced here because in failing to address the issue raised by the City's appeal but *sua sponte* finding that Adkins' due process rights were violated, the majority denies Adkins his victory in the trial court. This irony aside, review of an unbriefed issue should only take place in the rare case where the error is clear and obvious and based on clear precedent. *Givens*, 237 Ill.2d at 325-26. This is not such a case.

¶ 55    Adkins was not denied due process at his administrative hearing because he was afforded an opportunity to cross-examine Officer Nasir. Compare with *Danko v. Board of Trustees of City of Harvey Pension Board*, 240 Ill. App. 3d 633, 642 (1992) (finding that a police officer was denied a fair hearing when the Board refused to allow him to question or cross-examine his supervising officer about any possible bias). Although the ALJ limited the scope of Adkins' cross examination by disallowing three of the questions he posed to Officer Nasir, each question had already been

answered or was not relevant to the stop or to the gun that was recovered from Adkins' vehicle. The first question – "So you're telling me that everybody that pulls up on the side and parks, are you telling me you have to pull up on the side of a car to reverse and park as standing for you?" – simply asked Officer Nasir to provide a general definition of "standing." The second question – "So what was your reason for you stopping me?" – had already been answered by Officer Nasir. He testified on direct examination that he curbed Adkins vehicle because the vehicle was "double parked," and explained to Adkins on cross examination that his vehicle "could also be considered as standing" and [t]hat's what the violation is. A park/stand violation." The third question Adkins was precluded from asking Officer Nasir was if it was "proper procedure" for police to show a driver a weapon recovered from his vehicle or if the police just take the weapon. This was a general question about police procedure that had no bearing on whether a gun was recovered from Adkins' vehicle on the date in question. Accordingly, the ALJ was well within his discretion to limit the scope of Adkins' cross-examination of Officer Nasir. See *Scatchell v. Board of Fire and Police Commissioners for Village of Melrose Park,* 2022 IL App (1st) 201361, ¶¶ 117, 123-25 (noting that "an administrative body has broad discretion in conducting its hearings" and finding no abuse of discretion when the Board refused to allow a police officer who was terminated for violating departmental policies to question the police director about the treatment of other officers who violated departmental policies because proof that others received different treatment was "irrelevant to whether [the terminated police officer] broke the rules"); *Anderson v. Human Rights Commission*, 314 Ill. App. 3d 35, 44, 48 (2000) (stating that "the scope of cross-examination is generally left to the discretion of the trial court" and finding that "where an administrative proceeding gives the petitioner a fair opportunity to be heard, including the opportunity to cross-examine witnesses and present evidence, generally this is considered sufficient to insure due

24

process and a fair, impartial hearing"); *Klaeren v. Village of Lisle,* 202 Ill. 2d 164, 185-87 (2002) (noting that "the right [to cross-examine] is not unlimited and may be tailored by the municipal body to the circumstances specifically before it" and that an administrative body can restrict cross-examination based on subject matter, witnesses, or factual matters relevant to the agency's decision); *People v. Wilson,* 2012 IL App (1st) 092910, ¶ 24 (finding it "well established that while a trial court may not deprive a defendant of the right to question witnesses, it may limit the scope of cross-examination under its discretionary powers").

¶ 56    In addition, the ALJ's decision to limit the scope of Adkins' cross-examination did not prejudice Adkins in any way. As explained further below, the first two questions the ALJ disallowed related to the reasons for the stop and were irrelevant to the ultimate question at the impoundment proceeding, which was whether an unregistered firearm was found inside Adkins' vehicle. The majority finds that Adkins "suffered prejudice" when the ALJ disallowed Adkins' third question because "the ALJ terminated the questioning regarding the circumstances of the alleged firearm recovery." It then finds that because Adkins "stated during the hearing that the officers never showed him a firearm, *** any potential testimony from Nasir which supported Adkins on this point could have influenced the ultimate decision on whether Nasir's account regarding the alleged recovery was credible." But Adkins never challenged Officer Nasir's credibility or his testimony that he found a "loaded firearm with an extended magazine in the glove box of [Adkins'] vehicle." After hearing Officer Nasir's testimony, Adkins told the ALJ, "I'm not saying that they ain't saying the truth, but if they saying that we had a firearm at that time, we never saw a firearm at all." Thus, contrary to the majority's assertion, any "potential testimony" that Adkins may have elicited from Officer Nasir about "proper procedure" regarding weapons recovery from vehicles generally does not change the fact that ample evidence demonstrated that

an unregistered firearm was recovered from Adkins' vehicle. In addition, documents admitted into evidence confirmed Officer Nasir's testimony. First, the Vehicle Impound Seizure Report states that responding officers were searching Adkins' vehicle when they "located a loaded firearm in the glove box" and confirmed that "[n]either the driver [n]or pass[e]nger has a valid foid/CCL." Second, the Motor Vehicle Inventory Report identifies Adkins' vehicle and lists "firearms" as the reason the vehicle was towed, and the City's Exhibit 3a indicates that a semi-automatic pistol, a black magazine, and one live round of ammunition were inventoried after they were recovered from Akdins' vehicle. Nothing that Officer Nasir could have said in response to Adkins' third question about "proper procedure" regarding weapons recovery would have changed the fact that the evidence demonstrated that an unregistered firearm was recovered from Adkins' vehicle on the date in question.

¶ 57    Although Adkins asserted that he was unaware of the presence of the firearm in his vehicle, this is not a valid defense under the impoundment ordinance. See *Jackson v. City of Chicago*, 2012 IL App (1st) 111044, ¶ 33 (noting that the vehicle impoundment ordinance contains several exceptions, but an "innocent owner defense" is not one of them); *People v. Jaudon,* 307 Ill. App. 3d 427, 437 (1999) (rejecting a constitutional challenge to the validity of the City's ordinance allowing for seizure and impoundment of vehicles containing unregistered firearms even though it lacks an innocent owner defense, reasoning that "to the extent the owners of the impounded vehicles have lent their vehicles to persons who then engaged in criminal activity, they bear some responsibility for that usage and are, therefore, not truly innocent"). For this reason, because Adkins was not prejudiced by the ALJ's decision to limit the scope of his cross examination of Officer Nasir, he was not deprived of due process. See *Engle v. Department of Financial and*

*Professional Regulation*, 2018 IL App (1st) 162602, ¶ 43 ("A court will find a due process violation only if there is a showing of prejudice.")

¶ 58    I also disagree with the special concurrence, which concludes that the City failed to "satisf[y] its burden of proof *** under § 2-14-132(h)(4)." The City's sole burden was to prove, by a preponderance of the evidence, that Adkins' vehicle was properly impounded by the police. Again, section 8-20-070 of the Code states that "[t]he owner of record of any motor vehicle that contains: (i) a firearm that is carried of possessed in violation of any applicable state of federal law other than the expiration of a FOID card or concealed carry license of a person *** shall be liable to the City for an administrative penalty of $2,000 plus any towing and storage fees", and that "[a]ny such vehicle shall be subject to seizure and impoundment[.]" Chicago Municipal Code § 8-20-070. At the administrative hearing, Officer Nasir testified that he found a firearm in the glove box of Adkins' car and that he impounded the vehicle after determining that neither Adkins nor his son had a valid FOID card or CCL. A police report, a vehicle impoundment seizure report, and an inventory report confirmed Officer Nasir's testimony. Taken together, this evidence was more than sufficient to prove that the impoundment of Adkins' vehicle was not only proper, but that it was required by the Code.

¶ 59    Because the City met its burden of proving that impoundment was proper, the burden shifted to Adkins to provide a defense to impoundment. Section 2-14-132(h)(4) of the Code states that "a vehicle is not considered to have been used in a violation that would render the vehicle eligible for towing if: *the owner of the vehicle* provides adequate proof that a criminal court dismissed all of the alleged criminal violations for which the vehicle was impounded after a judicial finding of the facts of, or laws applicable to, such violations." (Emphasis added.) The special concurrence states that Adkins' comment at his May 16, 2022, hearing before the ALJ,

where he stated his belief that if the State "had any evidence to say that it was a firearm in here, the case would have went further than it did at bond hearing" is sufficient to meet his burden of proof under the Code. But nothing in Adkins' statement indicates that "the criminal court dismissed all of the alleged criminal violations for which the vehicle was impounded after a judicial finding of the facts." Therefore, Adkins did not present "adequate proof" required by the Code. At his impoundment hearing before the ALJ, which was held on June 1, 2022, Adkins presented no evidence regarding the disposition of the criminal case against his son; he never even mentioned it. The City highlighted as much in its closing argument, noting that Adkins "failed to make a defense recognized in the ordinance." Because Adkins bore the burden of presenting "adequate proof that a criminal court dismissed all of the alleged criminal violations for which the vehicle was impounded" under section 2-14-132(h)(4) of the Code, and he did not do so at either of his hearings before the ALJ, he failed to meet his burden of proof. Therefore, the impoundment was properly upheld by the ALJ.

¶ 60    The special concurrence states that Adkins "satisf[ied] his burden of coming forward with adequate proof" under section 2-14-132(h)(4) of the Code, but relies on statements Adkins made on administrative review during hearings before the trial court. While Adkins did make arguments on administrative review before the trial court that could support a possible defense under section 2-14-132(h)(4), no such arguments, or evidence to support such arguments, were ever presented to the ALJ. Accordingly, the special concurrence's reliance on these statements to support the contention that Adkins provided "adequate proof" under the Code is improper. See *Scatchell v. Board of Fire and Police Commissioners for Village of Melrose Park,* 2022 IL App (1st) 201361, ¶ 35 (internal citations omitted) ("Our review extends to all questions of fact and law the entire

28

record presents, but judicial review is strictly limited to the administrative record. We may not consider new or additional evidence beyond what was originally presented to the Board.")

¶ 61    I am not persuaded by the *sua sponte* reasoning of either of my colleagues. Instead, I would reverse the judgment of the trial court and affirm the ALJ's decision. I respectfully dissent.